# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

INFINIUM BUILDERS LLC,                )
KE HOLDINGS LLC d/b/a ASCENT          )
CONSTRUCTION, ENRIQUE SELMAN,         )
and JEAN LAFITTE BUILDERS LLC         )
f/k/a JEAN LAFITTE DESIGNS LLC, on    )
Behalf of Themselves and All Others   )
Similarly Situated,                   )
                                      )
    Plaintiffs,   )
                                      )    **Case No. 3:23-cv-00924**
v.                                    )    **Judge Aleta A. Trauger**
                                      )
METROPOLITAN GOVERNMENT OF            )
NASHVILLE & DAVIDSON COUNTY,          )
                                      )
    Defendant.    )

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 110) filed by defendant Metropolitan Government of Nashville & Davidson County ("Metro") along with a supporting Memorandum of Law (Doc. No. 111), seeking judgment in its favor on the two remaining claims asserted by the plaintiffs in this case: Count I, a takings claim; and Count III, a due process claim. The plaintiffs oppose the motion; Metro filed a Reply and a Notice of Supplemental Authority; and the plaintiffs, with permission, filed a Sur-reply. (Doc. Nos. 123, 127, 131, 134.) For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P.

56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002)). By its terms, Rule 56 anticipates "that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "[T]here must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry,

therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

## II. BACKGROUND

### A. The Plaintiffs' Claims

On August 30, 2023, plaintiffs Infinium Builders LLC ("Infinium") and KE Holdings LLC, doing business as Ascent Construction ("Ascent"), filed their original Class Action Complaint, seeking "legal and equitable relief on behalf of themselves and all others" similarly situated. (Doc. No. 1 ¶ 1.) After the filing of the first Amended Complaint in January 2024, the court granted in part Metro's Motion for Partial Judgment on the Pleadings, dismissing the plaintiff's unjust enrichment claim as barred by sovereign immunity. (Doc. No. 81.) The court also held that the continuing violations doctrine did not apply, as a result of which the plaintiffs' claims would be governed by the one-year statute of limitations that applies to claims under 42 U.S.C. § 1983 in Tennessee. (*Id.*)

With the filing of the plaintiffs' Second Amended Complaint ("SAC") in January 2025, Jean Lafitte Builders LLC f/k/a Jean Lafitte Designs LLC ("Jean Lafitte") and Enrique Selman, an individual, joined as plaintiffs, likewise pursuing claims "on behalf of themselves and all others" similarly situated. (Doc. No. 105, SAC ¶ 1.)

The plaintiffs seek injunctive relief and damages related to the enforcement of the Metro Sidewalk Ordinance ("Sidewalk Ordinance" or "Ordinance"), BL2019-1659, codified at Metro. Code § 17.20.120 *et seq.*, and "the misuse of funds paid pursuant to the Sidewalk Ordinance." (*Id.* ¶ 11.) The Sidewalk Ordinance was originally passed by Metro Council in 2017 and amended in 2019. (SAC ¶¶ 12–15.) On its face, it applies to the construction, development, or redevelopment of certain properties within certain areas of Metropolitan Nashville as designated by the Ordinance ("Covered Property"). (*Id.* ¶ 18.) Under the Ordinance, applicants for building permits for Covered

Property were required, in order to obtain a building permit, to (1) build or replace a sidewalk on the property; (2) make an "in-lieu payment"—that is, contribute to the fund for the pedestrian benefit zone ("Sidewalk Fund") in lieu of constructing a sidewalk; or (3) pay a fee and submit an application for a waiver of the Ordinance to the Metro Zoning Administrator ("MZA"). (*Id.* ¶ 19.)

The Sidewalk Ordinance requires that Fund contributions "shall be assigned and designated for implementation of the strategic plan for sidewalks and bikeways, as approved by the planning commission." (*Id.* ¶ 24 (quoting Metro. Code § 17-20-120(D)(2) (2019), Doc. No. 125-1).) The Ordinance further requires that Fund contributions "shall be allocated within ten years of receipt of the payment within the same pedestrian benefit zone as the property to be developed; otherwise, the payment shall be refunded to the building permit applicant." (*Id.* ¶ 25 (quoting Metro. Code § 17-20-120(D)(2) (2019)).)

In May 2023, Metro ceased enforcement of the Sidewalk Ordinance, following the Sixth Circuit's ruling in *Knight v. Metropolitan Government*, 67 F.4th 816 (6th Cir. 2023), which held that the question of whether the same Sidewalk Ordinance constituted an unconstitutional taking as applied to the plaintiffs in that case was governed by the "unconstitutional-conditions" test adopted by the Supreme Court in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), 1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and not by the "deferential 'balancing' test that the Court adopted to assess zoning restrictions in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978)." *Knight*, 67 F.4th at 818. "In the end," though, after deciding that the unconstitutional-conditions test applied, the court concluded that it was not required to apply the test, because Metro waived any argument as to its application in that case, expressly abandoning any defense under *Nollan*'s test. *Id.* at 836. In other words, the Ordinance was deemed

to have failed the *Nollan* test and, therefore, to be unconstitutional as applied to the plaintiffs. The court remanded, however, for this court to fashion an appropriate remedy. *Id.* at 837.

This court was not required to determine a remedy, however. Following remand, the *Knight* parties reached a settlement that included entry of a permanent injunction pursuant to which Metro ceased prospective enforcement of Metro. Code § 17.20.120 and removed all language from its website that referenced Metro. Code § 17.20.120 or its operative terms. *See* Agreed Order for Entry of Judgment, Exhibit 1, *Knight v. Metro. Gov't*, No. 3:20-cv-00922 (M.D. Tenn. Sept. 22, 2023), ECF No. 56.

Sometime in June 2023, shortly after the Sixth Circuit's decision in *Knight*, Metro created a website through which other entities and individuals who had complied with the Sidewalk Ordinance by building sidewalks or contributing to the Fund could seek reimbursement of their costs (the "Metro Sidewalk Claim Process"). On the Metro Sidewalk Claim Process website, Metro initially agreed to "consider[] for potential reimbursement" claims "where (1) the claimed costs were incurred on or after May 10, 2022, and (2) the claimant sought a variance from the Board of Zoning Appeals or paid under protest." (Doc. No. 41-2 at 1, Metro Sidewalk Claim Process website application in effect as of November 2023; *see also* SAC ¶ 70 (misquoting Metro Sidewalk Claim Process website).) Metro paid claims that it deemed in compliance with the claims criteria. (SAC ¶ 72.) These criteria remained visible to the public on the Metro Claim Process website until around November 16, 2023. (*Id.* ¶ 75.)

On or around November 16, 2023, however, Metro removed the language from its website stating that it would consider reimbursement of claims for costs incurred on or after May 10, 2022 and determined that it would instead subject all reimbursement claims to a one-year statute of limitations. (*Id.* ¶¶ 76–77.) According to the SAC, the plaintiffs and other putative class members

"could and did view the Metro Sidewalk Claim Process Website" prior to November 16, 2023 and that they "relied on the May 10, 2022 date published to the Metro Claim Process Website, filing claims, both denied and granted, for costs incurred on or after May 10, 2022." (*Id.* ¶ 74.) "Similarly, many chose to forego the filing of claims based on the understanding that Metro would not pay them because they fell outside one of these two criteria." (*Id.* ¶ 74.) However, as of November 16, 2023, Metro "unilaterally and without warning determined that it would apply a strict one-year statute [of limitations] to claims going forward." (*Id.* ¶ 77.)

In any event, all of the named plaintiffs in this case allege that they either paid in-lieu fees or constructed sidewalks in order to receive building permits authorizing them to develop certain properties within Metro Nashville; that Metro did in fact issue building permits; and that Metro eventually issued final use and occupancy ("U&O") letters with respect to those properties. In Count I of the SAC, the plaintiffs claim that Metro's conditioning the issuance of building permits on the plaintiffs' building a sidewalk or paying a fee in lieu of building a sidewalk constitutes an unconstitutional taking. (SAC ¶ 182.)[1]

In addition, the plaintiffs allege that Metro has not "allocated" all of the plaintiffs' payments into the Fund, as required by the Sidewalk Ordinance; that Metro does not "track the properties for which in-lieu fees were paid to determine whether and to what extent they were allocated"; that Metro has ceased allocating the Sidewalk Funds and has used such funds to reimburse claims made pursuant to the Sidewalk Claim Process; that, in making such payments, Metro has "diminished, reduced, or eliminated the unallocated funds that belong to Plaintiffs and the members of the Permit Applicant Due Process Class, depriving them of their property"; that

---

[1] The SAC also asserts that Metro's requirement that the plaintiffs grant an easement as a condition for issuing a building permit constituted an unconstitutional taking. (SAC ¶¶ 181–82.)

Metro does not provide a procedure for seeking a refund of unallocated funds; and, therefore, that the plaintiffs and putative class members have been deprived of their property without due process. (*Id.* ¶¶ 196–204.)

### B.    The Motion for Summary Judgment

Metro now seeks summary judgment on the named plaintiffs' remaining claims. It raises the following arguments:

(1) Infinium lacks standing to bring any claims in this lawsuit, because it did not own any of the properties at issue and the fees it paid were immediately reimbursed by the property owners;

(2) all of Ascent's and Jean Lafitte's claims are unripe, because they never sought or received a final decision from Metro as to the application of the Sidewalk Ordinance to their specific properties;

(3) alternatively, Ascent's and Jean Lafitte's takings claims are barred by the doctrine of voluntary payment;

(4) also alternatively, most of Ascent's and Jean Lafitte's takings claims are barred by the one-year statute of limitations, and all of Selman's claims, though ripe, are time-barred, and the plaintiffs cannot show that the statute of limitations should be extended by the doctrine of equitable estoppel or otherwise; and

(5) the plaintiffs' due process claims fail, because they cannot show arbitrary and capricious government action, for purposes of a substantive due process claim, and they have not shown a "present entitlement to any future, potential refunds of their paid in-lieu fees which are contingent upon several factors," for purposes of a procedural due process claim (Doc. No. 111 at 2).

(*See generally* Doc. No. 111.)

In their Response, the plaintiffs make several concessions or clarifications. First, they concede that Infinium, because it did not own the properties at issue, lacks standing to bring a takings claim, though they continue to argue that Infinium has standing to bring a due process

claim. (Doc. No. 123 at 13.[2]) Second, they make it clear that plaintiff Selman did not intend to state a due process claim. (*Id.* at 14.) And third, they agree that none of the named plaintiffs entered into an easement or dedicated a right-of-way to Metro. (*Id.*) They also do not seek to advance claims that would only be timely under their continuing violations theory, and they confirm that they bring a procedural due process claim, not a substantive due process claim.[3] They raise the following arguments in opposition to summary judgment:

> (1) the court should deny the Motion for Summary Judgment in its entirety, without prejudice, until after class certification and class notice, based on the rule against one-way intervention;
>
> (2) the plaintiffs were not required to pursue administrative exhaustion of their claims, and their claims became ripe for adjudication as soon as the plaintiffs complied with the Ordinance;
>
> (3) in any event, there is no prudential finality requirement for *"facial* challenges, like Plaintiffs' challenge here" (*id.* at 20);
>
> (4) administrative exhaustion would not have satisfied *Nollan* and *Dolan*;
>
> (5) alternatively, any ripeness requirement is satisfied by the issuance of U&O letters, following which the plaintiffs had no mechanism for pursuing a waiver or variance;
>
> (6) Metro bears the burden of establishing voluntary payment, which it cannot do in this case;
>
> (7) not all claims are barred by the statute of limitations, first, because the limitations period for *all* of the plaintiffs' claims—including Jean Lafitte's and Selman's, even though they did not join the lawsuit until January 2025—began

---

[2] Inexplicably, the plaintiffs did not number the first page of their Response in Opposition, as a result of which their pagination is inconsistent with that assigned by the court's electronic filing system. The court uses the CM/ECF pagination.

[3] The court previously granted in part Metro's Motion for Partial Judgment on the Pleadings, holding, as relevant here, that the statute of limitations for the plaintiffs' claims was not extended by the "continuing violations" doctrine. *Infinium Builders LLC v. Metro. Gov't*, No. 3:23-CV-00924, 2024 WL 4009874, at *8 (M.D. Tenn. Aug. 30, 2024). The plaintiffs have preserved their objections to that ruling for purposes of appeal but do not seek to relitigate claims that are clearly time-barred, absent application of the continuing violations doctrine. (*See* Doc. No. 123 at 10 n.5.)

running on August 30, 2022 (or one year prior to the filing of the original Class Action Complaint); second, because the plaintiffs' claims accrued on the date Metro issued U&O letters for the specific properties; and third, because Metro is equitably estopped from applying a limitations period different from the May 10, 2022 accrual date first identified on its Claim Process Website; and

(8) Metro is not entitled to summary judgment on the due process claim, because the Ordinance created an entitlement, requiring Metro to return the "specific funds" the plaintiffs paid into the Sidewalk Fund "if they are not used in accordance with the Ordinance," and Metro has interfered with their property interest by "us[ing] those funds for other, unauthorized purposes." (*Id.* at 33–34.)

In its Reply, Metro pounces on the plaintiffs' characterization of their takings claim as a facial challenge to the Sidewalk Ordinance as part of their argument for why exhaustion of administrative remedies was not required. Metro argues that, if indeed the plaintiffs intended to assert a facial challenge—which is not at all clear in the pleadings—then the claim accrued upon the passage of the Ordinance, making all of the plaintiffs' claims barred by the one-year statute of limitations. (Doc. No. 127 at 1.) The plaintiffs' Sur-reply addresses only Metro's contention that their facial challenge to the Sidewalk Ordinance is time-barred, arguing both that it is not time-barred and that they *also* raise and have never abandoned their as-applied challenge to the Sidewalk Ordinance. (Doc. No. 134.) They suggest, in fact, that a challenge to an "inherently contingent" legislative exaction such as the one at issue here must be brought as an as-applied challenge. (*Id.* at 3.)[4]

## III.    DISCUSSION

### A.    The Rule Against One-Way Intervention

Class actions are governed by Federal Rule of Civil Procedure 23. It is widely recognized that Rule 23 is both "intended to accommodate lawsuits to vindicate shared rights of widely-

---

[4] In light of the plaintiffs' position in their Sur-reply and the fact that the SAC does not characterize the claim as a facial challenge, the court construes the plaintiffs' challenge to the Sidewalk Ordinance an as-applied challenge.

dispersed individuals where joinder of all the interested parties would be impractical" and to provide "the full exoneration of those found innocent of alleged violations of collective rights." *In re Forson*, 583 B.R. 704, 709 (Bankr. S.D. Ohio 2018) (citation omitted). To achieve both of these goals—complete vindication of meritorious group claims and the complete exoneration of falsely accused defendants—"Rule 23 . . . requires both plaintiff class members (whether or not personally participating in the class action) and defendants to be bound by judgments on class claims." *Id.* (citation omitted). The class procedure thus protects the "interests of absentee class members and defendants" and "promote[s] judicial economy and efficiency by avoiding multiple adjudications of the same issues." *Id.* (quoting 5 Moore's Federal Practice ¶¶ 23.023, 23.02 (3d ed. 2017)).

Rule 23 provides that, "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). Usually, therefore, "courts decide class certification motions before addressing dispositive motions." *Forson*, 583 B.R. at 710 (quoting *Hyman v. First Union Corp.*, 982 F. Supp. 8, 11 (D.D.C. 1997)). At the same time, "the timing provision of Rule 23 is not absolute. Under the proper circumstances—where it is more practicable to do so and where the parties will not suffer significant prejudice—the district court has discretion to rule on a motion for summary judgment before it decides the certification issue." *Id.* (quoting *Wright v. Schock*, 742 F.2d 541, 543–44 (9th Cir. 1984)).

In other words, while Rule 23 favors early determination of the class issue, neither the rule nor due process "necessarily requires that the district court rule on class certification before [addressing] a motion for summary judgment." *Id.* (quoting *Thompson v. Cnty. of Medina*, 29 F.3d 238, 241 (6th Cir. 1994)). Generally, where "considerations of fairness and economy dictate otherwise, and where the defendant consents to the procedure, it is within the discretion of the

district court to decide the motion for summary judgment first." *Id.* (quoting *Thompson*, 29 F.3d at 241); *see also Taylor v. City of Saginaw*, 11 F.4th 483, 489 n.3 (6th Cir. 2021) (finding it "within the district court's discretion to resolve defendants' dispositive motion prior to class certification"); *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 616 (6th Cir. 2002) ("We have consistently held that a district court is not required to rule on a motion for class certification before ruling on the merits of the case." (citations omitted)).

One of the primary problems that arises when the court addresses a dispositive motion before a class certification motion is that of "one-way intervention." *Forson*, 583 B.R. at 710 (quoting *Hyman*, 982 F. Supp. at 11). "One-way-intervention" means that putative class members have the ability to sit on the sidelines and watch how a case is resolved, before opting into a class and without risking their individual claims. *See id.* In other words, *defendants* are "the risk-bearers in this situation," and the question of whether the court may resolve a summary judgment motion before ruling on class certification typically depends on whether the *defendants* have waived the right to have the certification motions decided first. *See id.* (quoting *Hyman*, 982 F. Supp. at 11). As the Sixth Circuit has stated:

> Here's the general rule: When the defendant moves for and obtains summary judgment before the class has been properly notified, the defendant waives the right to have notice sent to the class, and the district court's decision binds only the named plaintiffs. "In such a situation, the defendants . . . assume the risk that a judgment in their favor will not protect them from subsequent suits by other potential class members, for only the slender reed of *stare decisis* stands between them and the prospective onrush of litigants."

*Faber v. Ciox Health, LLC*, 944 F.3d 593, 602–03 (6th Cir. 2019) (quoting *Schwarzschild v. Tse*, 69 F.3d 293, 297 (9th Cir. 1995)) (citation modified)).

Here, the plaintiffs invoke the one-way intervention rule while also recognizing that the rule is primarily intended to protect defendants. The plaintiffs argue that ruling on the defendant's summary judgment motion now gives rise to the potential for protracted litigation if the *defendant*

later claims that a ruling on its summary judgment violated the rule against one-way intervention. This fear is entirely speculative. The defendant is the party moving for summary judgment and has clearly waived its right to have class certification decided first. Moreover, the court finds that resolution of the Motion for Summary Judgment will have the benefit of substantially narrowing the issues to be resolved, even if a class is ultimately certified. The court, therefore, will exercise its discretion to rule on the Motion for Summary Judgment now, rather than deferring it until after resolution of any class certification motion.

### B. The Takings Claim

#### 1. Ripeness

Generally, "a takings claim challenging the application of land-use regulations is not ripe"—has not accrued—"unless 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001) (quoting *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott*, 588 U.S. 180 (2019)). Although *Knick* overruled *Williamson County*'s state-court-exhaustion requirement, the Supreme Court has recognized that *Knick* "left untouched *Williamson County*'s alternative holding that plaintiffs may challenge only 'final' government decisions." *Pakdel v. City of San Francisco*, 594 U.S. 474, 477 (2021) (citing *Knick*, 588 U.S. at 188). Courts considering the issue post-*Knick* have likewise continued to hold that "[a]s-applied takings and substantive due process claims are not ripe until a plaintiff receives a final decision regarding the application of the regulations to the property at issue." *Ballard v. City of W. Hollywood*, No. 24-538, 2025 WL 618110, at *1 (9th Cir. Feb. 26, 2025) (citing *Williamson Cnty.*, 473 U.S. at 186);

*accord SW Nashville EB Owner, LLC v. Metro. Gov't*, No. 3:24-cv-00710, 2025 WL 875366, at

*9 (M.D. Tenn. Mar. 20, 2025) (collecting cases).[5]

"The finality requirement is relatively modest. All a plaintiff must show is that 'there [is]

no question . . . about how the regulations at issue apply to the particular land in question.'" *Pakdel*,

594 U.S. at 478 (quoting *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. at 739) (some internal

quotation marks omitted). Indeed, "[t]he rationales for the finality requirement underscore that

nothing more than *de facto* finality is necessary. This requirement ensures that a plaintiff has

actually 'been injured by the Government's action' and is not prematurely suing over a

hypothetical harm." *Id.* (quoting *Horne v. Dep't of Agric.*, 569 U.S. 513, 525 (2013)). Although

the Sixth Circuit, unlike some other circuits, applies the "finality" test "to both regulatory and

physical takings claims, courts have further sculpted the ripeness doctrine to fit the type of takings

claim involved." *Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 388 (6th Cir. 2022) (internal

quotation marks and citations omitted).[6]

---

[5] The finality requirement does not apply to facial challenges to regulations. *Wilkins v. Daniels*, 744 F.3d 409, 417 (6th Cir. 2014). As noted above, the court considers the plaintiffs' takings claim to be an as-applied challenge.

[6] The Ninth Circuit has held that "*Williamson County* applies only to regulatory, not *per se*, takings." *Fowler v. Guerin*, 899 F.3d 1112, 1117 (9th Cir. 2018). A decision from the District of Oregon with a fact pattern closely analogous to the one here recently held, based on *Fowler*, that the plaintiffs were not required to pursue an administrative appeal to satisfy the finality requirement. *Newberg Crestview, LLC v. City of Newberg*, No. 3:22-CV-1289-AR, 2023 WL 8372167, at *5 (D. Or. Dec. 4, 2023). In that case, the plaintiff's request for approval of a development project was conditioned on the plaintiff's making public infrastructure improvements near its property, including, among other things, building sidewalks. The plaintiff brought a takings claim, and the city moved for dismissal on the basis that the claim was unripe because the plaintiff had not alleged a final decision and had not followed proper appeal procedures. *Id.* at *1, 3. The court rejected that argument, characterizing the takings claim as a "land-use exaction claim" and defining "land-use exaction" as occurring "when government demands property in exchange for approval of a land-use permit." *Id.* at *4. In other words, land-use exaction claims are those governed by *Nollan* and *Dolan*, as extended by *Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013). The Oregon District Court stated, "*Williamson County*'s finality requirement does not apply to land-use exaction claims. . . . The finality requirement 'developed

However, as *Barber* explained, in a case involving a physical taking, "the taking itself is viewed as a final action." *Id.* In this case, the plaintiffs achieved finality when they were assessed a fee in exchange for a building permit, paid the fee, and were issued a building permit. The time to appeal has expired, and the record strongly suggests that appeals would have been largely futile anyway, except under the narrow circumstances described by the Ordinance. *See* Metro. Code § 17.20.120(A)(3). More to the point, the plaintiffs are not awaiting a decision, and "there [is] no question . . . about how the 'regulations at issue apply to the particular land in question.'" *Pakdel*, 594 U.S. at 478 (quoting *Suitum*, 520 U.S. at 739). No avenue remains open for the government to clarify or change its position. Upon paying into the Sidewalk Fund to satisfy a condition for obtaining a building permit, each plaintiff was actually "injured by the Government's action and

---

in the regulatory taking context,' and has not been extended to other types of takings." *Newberg* , 2023 WL 8372167, at *4 (quoting *Suitum*, 520 U.S. at 733 n.6; and then citing *Pakdel*, 594 U.S. at 475 ("When a plaintiff alleges a regulatory taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has reached a 'final' decision.")). As the court explained:

> Indeed, the justification for the finality requirement is only applicable in the context of regulatory takings. The requirement "follows from the principle that only a regulation that 'goes too far' results in a taking." *Suitum*, 520 U.S. at 734 (citation omitted). "A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *Id.* The factors that a court must examine in a regulatory takings case, including economic impact and interference with reasonable investment-backed expectations, "simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson County*, 473 U.S. at 191.

> That reasoning does not apply to land-use exaction claims, which are not based on broadly applicable regulations that "go[] too far" and do not entail the same fact-intensive inquiry as do regulatory takings claims. *See Koontz*, 570 U.S. at 614 (distinguishing between "*Penn Central*'s essentially *ad hoc*, factual inquiry" and "the *per se* takings approach" used in exaction cases).

*Id.* at *5. This court would be inclined to agree, but the Sixth Circuit, as noted above, continues to apply *Williamson County* to land-use exaction claims as well as to regulatory takings claims.

is not prematurely suing over a hypothetical harm." *Pakdel*, 594 U.S. at 478 (internal quotation marks and citation omitted).

The situation here is entirely unlike that in *SW Nashville*, for example, in which the plaintiff sought to challenge Metro's failure to issue a building permit, and this court dismissed the case as unripe. *SW Nashville*, 2025 WL 875366, at *1. There, Metro had not yet made a decision and had instead placed the permit application on hold, pending a roadway assessment and a determination of whether an anticipated new roadway would impact the plaintiff's property. Thus, at the time the plaintiff filed suit, "it remain[ed] entirely unclear whether Metro [would] . . . deny the plaintiff's Application and institute condemnation proceedings or, instead, resituate the projected roadway and grant the Application." *Id.* at *12. The court dismissed without prejudice the takings claims under federal and state law on ripeness grounds. *Id.*

Nor does this case resemble any of those cited by the defendant. In *Andrews*, for example, the Sixth Circuit reversed the district court's decision dismissing the plaintiff trust's takings claim, which stemmed from the defendant city's denial of the trust's rezoning application. *Andrews*, 11 F.4th at 465–66. The question at issue on appeal was whether "the discretionary nature of City's denial of the Trust's application for rezoning of its property . . . deprives the Trust of a cognizable property interest to challenge the current . . . zoning of its property for takings purposes." *Id.* at 470. The Sixth Circuit found a cognizable property interest and observed in passing only that "a plaintiff's failure to seek discretionary allowance for an otherwise proscribed use of their property—say, through a permit or application for a variance—will often doom their takings claim as unripe." *Id.* at 469. But it did not reach the ripeness question in that case, and Metro has not pointed to any cases with facts similar to those here dismissing takings claims as unripe.

The court also pauses to recognize the distinction between prudential and jurisdictional ripeness. "If a case is 'dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all,' it is not constitutionally ripe." *Carman v. Yellen*, 112 F.4th 386, 400 (6th Cir. 2024) (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam)) (some internal quotation marks omitted). Prudential ripeness, on the other hand, "is concerned with (1) whether a claim is fit for judicial review; and (2) the hardship to the parties." *Id.* at 401 (citing *Kiser v. Reitz*, 765 F.3d 601, 607 & n.2 (6th Cir. 2014)). The finality requirement is a prudential rather than jurisdictional consideration and is not applied "mechanistically." *Lilly Invs. v. City of Rochester*, 674 F. App'x 523, 526 (6th Cir. 2017). Moreover, application of the prudential ripeness doctrine "requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances." *Jackson v. City of Cleveland*, 925 F.3d 793, 807 (6th Cir. 2019) (internal quotation marks and citation omitted). Here, there is no reason to withhold judicial resolution. As set forth above, the plaintiffs need only demonstrate that Metro has "reached a final decision regarding the application of the regulation to the property at issue." *Id.* (quoting *Williamson Cnty.*, 473 U.S. at 186). Applying this standard, the court finds that the plaintiffs' takings claims are ripe.

### 2. The Voluntary Payment Doctrine

Metro also argues that the plaintiffs' takings claims fail, because each of them (with certain exceptions not relevant here) voluntarily complied with the Sidewalk Ordinance without protesting or objecting. This argument—which is conceptually related to Metro's ripeness argument—posits that a plaintiff cannot show that "he or she has been compelled to hand over property unless and until the government decides whether its law or regulation will be applied to [the] property." (Doc. No. 111 at 12 (citing *Palazzolo*, 533 U.S. at 620–21).) The cases Metro cites for the proposition that a plaintiff's "voluntary surrender of property to the government" bars a takings claim largely

involve due process claims decided in the context of plaintiffs' voluntary payment of fines for civil or criminal infractions. (*See id.* at 13 (citing, *e.g.*, *Gradisher v. Cnty. of Muskegon*, 255 F. Supp. 2d 720, 728 (W.D. Mich. 2003), *aff'd*, 108 F. App'x 388 (6th Cir. 2004); *Evans v. City of Ann Arbor*, No. 21-10575, 2022 WL 586753, at *10 (E.D. Mich. Feb. 25, 2022), *aff'd*, No. 22-1774, 2023 WL 5146731 (6th Cir. Aug. 10, 2023)).) None of the cited cases involves the unconstitutional-conditions doctrine. The court finds that they are of little relevance to the issue presented here.

Moreover, voluntary payment is an affirmative defense on which the burden of proof rests with the party asserting it. *U.S. Small Bus. Admin. v. McDonald*, 772 F.2d 909 (6th Cir. 1985); *Pratt v. Smart Corp.*, 968 S.W.2d 868, 872 (Tenn. Ct. App. 1997). Under Tennessee law, the defense "is not universally applicable to all transactions" and, in particular, "does not come into play in situations involving a transaction that violates public policy." *Pratt*, 968 S.W.2d at 872. Here, the mere fact that the plaintiffs paid the in-lieu fee in order to obtain a building permit, without formally protesting or objecting, does not establish the elements of voluntary payment. In addition, an unconstitutional condition is arguably, by its nature, coercive and violative of public policy. The court will not apply the voluntary payment doctrine in this setting. *Accord Heritage at Pompano Hous. Partners, L.P. v. City of Pompano Beach*, No. 20-61530-CIV, 2021 WL 8875658, at *7 (S.D. Fla. Dec. 15, 2021) (denying defendant's motion for summary judgment on "acquiescence" grounds in an unconstitutional-conditions case)

### 3. Statute of Limitations

The remaining question is which, if any, of the alleged takings fall within the applicable statute of limitations. The plaintiffs have effectively conceded that takings claims related to a number of their properties, as identified in discovery and enumerated by Metro in support of its motion, would be time-barred under any metric. No further discussion of those properties is

necessary. Likewise, Metro concedes for purposes of summary judgment that, if the claims are not barred by ripeness and voluntary payment, Ascent has takings claims relating to the payment of the in-lieu fee for five properties that would not be time-barred: (1) 1407 Harding Place; (2) 3998 Harding Place; (3) 4000 Harding Place; (4) 796 Montrose Avenue; and (5) 2509 Vaulx Lane. Metro's motion will be denied with respect to these properties without further discussion.

The parties dispute whether a number of other claims would be time-barred, including:

(1) property owned by Ascent located at 1323 Harding Place;

(2) property owned by Lafitte located at 6205 Freedom Drive, 6207 Freedom Drive, 646A Vernon Avenue, and 646B Vernong Avenue; and

(3) property owned by Selman located at 2838 A Bronte Avenue and 2838B Bronte Avenue.

Regarding 1323 Harding Place, it is undisputed that Ascent paid the in-lieu fee on June 14, 2022, and Metro issued the U&O Letter on September 19, 2023. Lafitte paid the in-lieu fees for its four properties in 2021 (the Freedom Drive properties) and 2023 (the Vernon Avenue properties), and Metro issued U&O Letters for these parcels in June 2023 and March 2023, respectively.

For his two properties, Selman actually built sidewalks, which were completed in April 2023 and for which U&O Letters were issued in 2023. However, Selman sought a waiver from the Sidewalk Ordinance prior to building the sidewalks. It is undisputed that Metro's final decision denying the request for a waiver was issued on April 26, 2022, and Selman's building permit issued shortly thereafter. (*See* Doc. No. 110-1 at 94–98.)

Metro asserts that, for any of Ascent's claims to be timely, they must have accrued no later than August 30, 2022, or one year before Ascent filed suit, and that, for Lafitte's and Selman's claims to be timely, they must have accrued no later than January 27, 2024, or one year before the filing of the SAC joining them as plaintiffs. (Doc. No. 111 at 14–15.) It also asserts that Selman's

claims accrued, at the latest, on the date Metro issued its final decision regarding a waiver. For Ascent and Lafitte, Metro's position is that the claims accrued on the date they paid the in-lieu fees. By Metro's calculations, all of the above-referenced disputed claims are untimely.

The plaintiffs argue first that, with respect to all of these properties, the running of the statute of limitations is tolled by equitable estoppel, as a result of Metro's posting on the Sidewalk Claim Process Form that it would consider claims for costs incurred on or after May 10, 2022. Second, the plaintiffs contend that, if equitable estoppel does not apply, then their claims are timely so long as they accrued within one year before the filing of the original Complaint, because Lafitte and Selman both benefit from tolling under the doctrine announced in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974). The plaintiffs also contend that their claims did not accrue, and the limitations period did not begin to run, until Metro issued a U&O Letter for each property, as "[t]hat is when Metro determined that Plaintiffs and other property owners had complied with the Sidewalk Ordinance and the sidewalk was approved for public use." (Doc. No. 123 at 31.) Based on these arguments, the plaintiffs' disputed claims would all be timely.

As set forth below, the court finds that the plaintiffs cannot establish that equitable estoppel applies, but Lafitte and Selman are entitled to *American Pipe* tolling. However, the claims accrued upon the takings, not the issuance of the U&O Letters.

a)      *Equitable Estoppel*

"When the doctrine of equitable estoppel is applicable, it prevents a defendant from asserting what could be an otherwise valid statute of limitations defense." *Redwing v. Cath. Bishop*, 363 S.W.3d 436, 460 (Tenn. 2012) (citation omitted). The party invoking the doctrine has the burden of proof. *Id.* When properly asserted and applicable, equitable estoppel "tolls the running of the statute of limitations when the defendant has misled the plaintiff into failing to file

suit within the statutory limitations period." *Id.* (citing *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 145 (Tenn. 2001)). As the Tennessee Supreme Court has further explained,

> whenever a defendant has made out a *prima facie* statute of limitations defense, the plaintiff must demonstrate that the defendant induced him or her to put off filing suit by identifying specific promises, inducements, suggestions, representations, assurances, or other similar conduct by the defendant that the defendant knew, or reasonably should have known, would induce the plaintiff to delay filing suit.

*Id.* That is, the doctrine "applies only when the defendant engages in misconduct." *Id.* (citing *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 849 (Tenn. 2010)). "The focus of an equitable estoppel inquiry 'is on the defendant's conduct and the reasonableness of the plaintiff's reliance on that conduct.'" *Id.* at 461 (quoting *Hardcastle v. Harris*, 170 S.W.3d 67, 85 (Tenn. Ct. App. 2004)).

Examples of situations in which courts have equitably estopped defendants from asserting a statute of limitations defense include when a defendant "promises not to assert a statute of limitations," "promises to pay . . . the plaintiff's claim without requiring the plaintiff to file suit," or "promises to settle a claim without litigation following the conclusion of another proceeding between the defendant and a third party." *Id.* at 460–61 (citations and footnotes omitted).

In this case, Metro posted a website some time in June 2023, within a month after *Knight* was issued, in which it initially agreed to "consider[] for potential reimbursement" claims submitted through the website that met two criteria: "(1) the claimed costs were incurred on or after May 10, 2022, and (2) the claimant sought a variance from the Board of Zoning Appeals or paid under protest." (Doc. No. 41-2 at 1, Metro Sidewalk Claim Process website application in effect as of November 2023.) Around November 16, 2023 (*i.e.*, several months after this lawsuit was filed), Metro replaced the first criterion with language stating that it would consider reimbursement of claims for costs incurred within one year prior to submission of the claim. (SAC

¶¶ 76–78.) The website did not promise payment of any claims—it promised only to *consider* claims that met the stated criteria.

Notably, although the plaintiffs allege that Infinium submitted claims through the Metro Sidewalk Claim Process website (*see* SAC ¶ 80), none of the other plaintiffs are alleged to have submitted claims prior to filing this lawsuit. Instead, they state that "those [named plaintiffs and putative class members] who intended to assert claims as part of the Metro Claim Process, but did not prior to Metro's unilateral change to the criteria, will now have any claim for costs incurred between May 10, 2022, and August 30, 2022, denied by Metro as untimely." (*Id.*) Thus, for example, Ascent "paid in lieu sidewalk fees for property between May 10, 2022 and August 30, 2022, which Metro might have approved but which would now be denied as untimely." (*Id.*)

Of course, if a claimant submitted a timely claim through the website that met Metro's criteria, and Metro delayed payment of the claim and then denied it after the limitations period for filing suit had expired, such a claimant would arguably have a colorable basis for asserting that the limitations period should be tolled through equitable estoppel. But none of the plaintiffs here (aside from Infinium, whose claims will be dismissed for lack of standing) submitted timely claims. And the website, standing alone, did not constitute a promise to pay claims at all, much less a promise to pay them without litigation or a promise to waive the statute of limitations. On its face, the website stated that Metro would "consider" claims submitted using the established procedure that met the criteria identified on the website. Any claimant who delayed filing a potentially meritorious claim in reliance on the website cannot be deemed to have behaved reasonably. And claimants who knew that they did not meet the identified criteria were immediately put on notice that they would have to follow some other procedure to pursue their claims. Moreover, although the plaintiffs allege in the SAC that Metro *might have* approved

Ascent's claims if they had been submitted through the Sidewalk Claim Process website, they do present any proof that Ascent relied on the website or that Ascent met both criteria identified on the website.

More importantly, Metro's initial decision to extend the limitations period following *Knight* and its later decision to begin relying on a one-year limitations period beginning approximately six months after *Knight* was issued cannot be characterized as "misconduct," and nothing about the Metro Sidewalk Claim Process website was misleading. The website did not remotely imply—much less promise—that lawsuits to recover sidewalk fees would be subject to the same criteria. The fact that the Claim Process apparently relied on legal principles (finality/ripeness and voluntary payment) that this court has now rejected does not change that conclusion. The plaintiffs have not presented any facts that justify application of equitable estoppel to toll the statute of limitations.

> b)       *American Pipe Tolling*

In *American Pipe*, the Supreme Court held that motions to intervene filed by putative class members shortly after class certification was denied were timely, because "the commencement of the original class suit tolls the running of the statute [of limitations] for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." *Am. Pipe*, 414 U.S. at 553. This concept is now known as *American Pipe* tolling. The Supreme Court subsequently extended *American Pipe* tolling to class members who opt out, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 n.13 (1974), and to plaintiffs who file separate actions after the denial of class certification, *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983).

The Second, Third, Ninth, and Tenth Circuits have held that *American Pipe* tolls the limitations period for individual claims filed both before and after the certification stage—that is,

that presumptive class members are not required to wait for a ruling on class certification before opting to file their own individual lawsuit. *See Aly v. Valeant Pharms. Int'l Inc.*, 1 F.4th 168, 180 (3d Cir. 2021); *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1009 (9th Cir. 2008); *State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1228 (10th Cir. 2008); *In re Worldcom Sec. Litig.*, 496 F.3d 245, 255 (2d Cir. 2007) ("Nothing in the Supreme Court decisions . . . suggests that the rule should be otherwise for a plaintiff who files an individual action before certification is resolved. To the contrary, the Supreme Court has repeatedly stated that 'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.'" (quoting *Crown*, 462 U.S. at 353–54) (some internal quotation marks omitted)).

The Sixth Circuit alone[7] has expressly held, to the contrary, that plaintiffs who file independent actions before a decision on class certification in the initial class action forfeit *American Pipe* tolling. *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 791 (2016) (citing *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 568 (6th Cir. 2005)). Although the court in *Stein* recognized that *Wyser-Pratte* "now represents the minority rule" and expressed "doubts about its holding," it also recognized that *Wyser-Pratte* "remain[ed] controlling." *Id.* at 789.

In this case, Metro, without referencing *American Pipe*, *Stein*, or *Wyser-Pratte*, asserts that, to be timely, any claims brought by Lafitte and Selman must have accrued within one year prior to January 27, 2025, when the SAC identifying them as plaintiffs was filed. Relying on *American Pipe*, the plaintiffs respond that, as "members of the classes" pleaded in the original Complaint,

---

[7] The First Circuit has stated in *dicta* that the "policies behind Rule 23 and *American Pipe* would not be served, and in fact would be disserved, by guaranteeing a separate suit at the same time that a class action is ongoing." *Glater v. Eli Lilly Co.*, 712 F.2d 735, 739 (1st Cir. 1983).

Lafitte and Selman "get the benefit of tolling as of the date of that filing." (Doc. No. 123 at 30 (citing *Am. Pipe*, 414 U.S. at 554).) Metro replies that Lafitte's and Selman's claims are time-barred under *Stein*, effectively conflating intervention with independent actions. (Doc. No. 127 at 2–3.)

Neither party addresses the (sparse) relevant caselaw pertaining to the addition of new plaintiffs to a proposed class action prior to certification, as distinct from the filing of a separate action by class members prior to certification. Those few district courts within the Sixth Circuit faced with this issue have largely extended *American Pipe* to permit the proposed amendments, but without addressing how *Stein*/*Wyser-Pratt* might impact the analysis. *See, e.g.*, *LaDrigue v. City of Bay City*, No. 1:19-CV-11196, 2022 WL 1205000, at *2 (E.D. Mich. Apr. 22, 2022) (granting the plaintiff's motion to amend to add a new class representative and holding that the new plaintiff's claims were timely, having been tolled under *American Pipe* when the original complaint was filed (citing *Phillips v. Ford Motor Co.*, 435 F.3d 785, 788 (7th Cir. 2006)); *Smith v. Leis*, No. 1:08-CV-00234, 2009 WL 1687945, at *2 (S.D. Ohio June 12, 2009) (same); *Bromley v. Mich. Educ. Ass'n-NEA*, 178 F.R.D. 148, 158 (E.D. Mich. 1998) (same).

The question, then, is whether the Sixth Circuit would treat intervening plaintiffs the same way it has treated plaintiffs filing a wholly separate action. At least one opinion from the Seventh Circuit suggests that it might not. Notably, in *Phillips v. Ford Motor Co.*, the named plaintiffs in two putative class actions sought to add additional named plaintiffs to avoid the statute of limitations. *Phillips*, 435 F.3d at 786. As a result, the Seventh Circuit addressed essentially the same question presented here: "whether amending a complaint to add or substitute named plaintiffs

(class representatives) 'commences' a new suit." *Id.*[8] The Seventh Circuit noted that "[r]elation back to add named plaintiffs in a class action suit is of particular importance because of the interests of the unnamed members of the class." *Id.* at 788. To illustrate this concern, the court posed a hypothetical: "Suppose Mr. X files a class action and after the statute of limitations has run the defendant settles with X. If a named plaintiff cannot be substituted for X with relation back to the date of the filing of the original complaint, the class will be barred from relief." *Id.* The Seventh Circuit concluded that, because the new plaintiffs stated claims arising out of "the same transaction or occurrence set up in the original pleading," and because the filing of a class action "tolls the statute of limitations for class members," the addition of the new plaintiffs "did not commence new suits." *Id.*

In light of the dearth of authority on this question and the fact that the Sixth Circuit itself has cast doubt on the continuing validity of *Wyser-Pratt*, the court finds that the appellate court would not treat intervening plaintiffs the same way it has treated plaintiffs filing independent actions. The court further holds that, because Lafitte and Selman did not commence new lawsuits and instead were simply added to this one, they benefit from *American Pipe* tolling.

c)     <em>Accrual of the Claims</em>

The statute of limitations for § 1983 claims is the relevant state's statute of limitations for personal injury torts. *Beaver St. Invs., LLC v. Summit Cnty.*, 65 F.4th 822, 826 (6th Cir. 2023)

---

[8] In *Phillips*, the Seventh Circuit was presented with two petitions for leave to appeal from orders remanding two class action suits to Illinois state courts. The petitions were filed under the Class Action Fairness Act of 2005, Pub. L. 109–2, 119 Stat. 4 (Feb. 18, 2005), and the question they presented was "whether amending a complaint to add or substitute named plaintiffs (class representatives) 'commences' a new suit" under the Act. *Phillips*, 435 F.3d at 786. Because the suits were filed before the effective date of the Class Action Fairness Act but the amendments were filed *after* it, "if the amendments are deemed to commence new suits, these suits are removable to federal district court; otherwise not." *Id.*

(citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)). There is no dispute that the one-year statute of limitations in Tenn. Code Ann. § 28-3-104(a)(3) applies to civil rights claims arising in Tennessee. *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015). Thus, because equitable estoppel does not toll the limitations period, but Lafitte and Selman benefit from *American Pipe* tolling, all of the plaintiffs' claims, to be timely, must have accrued on or after August 30, 2022, or one year before the original Complaint was filed.

So when did the claims accrue? As indicated above, the parties disagree on this question, too. The plaintiffs suggest, without citing any authority, that the date on which their claims became "final," for ripeness purposes, is not necessarily the same date on which the claims accrued. (*See* Doc. No. 123 at 30 ("Metro conflates its proposed finality/ripeness standard with the date a claim accrued . . . .").) The plaintiffs assert that the date on which Metro issued U&O Letters, thus signifying that "property owners had complied with the Sidewalk Ordinance and the sidewalk was approved for public use," should be deemed the accrual date. (*Id.*)[9] Alternatively, the plaintiffs posit that their claims accrued on the date on which in-lieu fees were paid. (*Id.*)

Metro suggests that Selman's claims related to his property on Bronte Avenue accrued on April 26, 2022, the date on which the zoning administrator issued a final decision on Selman's application for a waiver. (Doc. No. 111 at 17.) It asserts that Ascent's and Lafitte's claims accrued upon payment of the in-lieu fee.

Although the limitations period for § 1983 actions is borrowed from state law, federal law governs when the limitations period begins to run. *Wallace*, 549 U.S. at 388; *Beaver St. Invs.*, 65

---

[9] Metro does not respond to the plaintiffs' Statement of Additional Facts identifying the significance of the U&O Letters, other than to state that these are not material facts. (*See* Doc. No. 128, Metro Resp. SAF ¶¶ 16–19.) The court therefore finds that these facts are not disputed for purposes of summary judgment.

F.4th at 826. "The 'standard rule' is that the statute of limitations for § 1983 claims begins to run when a 'plaintiff has a complete and present cause of action . . . .'" *Beaver St. Invs.*, 65 F.4th at 826 (6th Cir. 2023) (quoting Wallace, 548 U.S. at 388) (alteration in original). A complete cause of action arises "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (quoting *Kuhnle Bros., Inc. v. Cnty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997)). To determine the date on which a § 1983 action accrues, courts look "to what event should have alerted the typical lay person to protect his or her rights." *Id.* (citation omitted).

For takings claims, a property owner has an actionable claim "when the government takes his property without paying for it . . . and therefore may bring his claim in federal court under § 1983 at that time." *Knick*, 588 U.S. at 185. That is, "'the act of taking' is the 'event which gives rise to the claim for compensation.'" *Id.* at 190 (quoting *United States v. Dow*, 357 U.S. 17, 22 (1958)).

Here, for the plaintiffs who paid the in-lieu fee to obtain a building permit and did not appeal, the taking was complete upon payment of the fee to secure a building permit. At that time, a "typical lay person" would have been alerted to the need "to protect his or her rights." *Beaver St. Invs.*, 65 F.4th at 826. A taking had occurred, and the affected property owner could have filed suit immediately, without waiting for a U&O Letter. This means that Ascent's claim related to the property at 1323 Harding Place, for which it paid the in-lieu fee on June 14, 2022, is time-barred. Lafitte's claims related to properties at 646A and 646B Vernon Avenue are not time-barred, as the in-lieu fees were paid in February 2023, but its claims related to the Freedom Avenue properties are time-barred, as the in-lieu fees were paid in 2021, well outside the one-year limitations period.

For Selman, who sought a waiver, his claims accrued either on the date on which his request for a waiver was denied or when he acquiesced to that ruling and obtained a building permit,

because Metro's decision was final—and Selman should have known that he needed to protect his rights—at that time. The date on which the sidewalk construction was completed and approved is merely incidental; Selman had no need to wait until the sidewalk construction on his property had been completed to know that his rights had been violated. Because his request for a waiver was denied in April 2022, and the building permit was issued in June 2022 (*see* Doc. No. 110-1 at 94–98), his claims are clearly time-barred.

In sum, the court finds that several of Ascent's and Lafitte's claims may proceed, but Metro is entitled to summary judgment on the plaintiffs' time-barred takings claims.

### C. The Due Process Claim

#### 1. *The Parties' Positions*

As set forth above, the Sidewalk Ordinance requires that Metro use in-lieu fees paid by permit applicants in accordance with the Ordinance within ten years of receipt or return the payment to the property owner. The relevant provision states in full:

> Any such contributions [to the fund for the pedestrian benefit zone in lieu of construction] received by the metropolitan government shall be assigned and designated for implementation of the strategic plan for sidewalks and bikeways, as approved by the planning commission. The applicant's payment shall be allocated within ten years of receipt of the payment within the same pedestrian benefit zone as the property to be developed; otherwise, the payment shall be refunded to the building permit applicant.

(Doc. No. 125-1, Metro. Code § 17.20.120(D)(2).)

The plaintiffs' position is that Metro has used their payments "for other, unauthorized purposes." (Doc. No. 123 at 34 (citing Kumrow Dep., Doc. No. 110-2 at 38; Metro's Resp. to Pls.' 2d Set of Interrogs., Doc. No. 125-4 ¶ 6).) They claim that Metro's unauthorized use has diminished the amount of money in the Sidewalk Fund and, moreover, that, "[o]nce the funds are paid, the Ordinance provides no process to challenge the use of the funds or to ensure the funds are used in accordance with the requirements of the Ordinance." (*Id.* (citing Metro. Code §§

17.20.120, 17.20.125).) Thus, they contend that they are "permit applicants" who submitted in-lieu payments but who have no "procedural recourse outside of this litigation" for reimbursement of those funds in accordance with the Ordinance. (*Id.*)[10]

In support of their due process claim, the plaintiffs assert that they have a protected property interest in the return of "those specific funds" that they paid into the Sidewalk Fund "if they are not used in accordance with the Ordinance" (*id.*) and that Metro has "deprived them of this property" by "us[ing] in-lieu payments on expenditures other than building sidewalks within the pedestrian benefit zone from which the funds were received" (*id.* at 36).

Kristin Kumrow, Assistant Director, Finance, for Metro's Department of Transportation ("NDOT"), testified regarding the receipt of, and accounting for, funds allocated to the Sidewalk Fund. According to Kumrow, once an in-lieu payment was received by NDOT from Metro's codes division, the payment would be deposited into "the general Metro bank account," and "the appropriate general ledger accounting string was assigned to the deposit so that NDOT could identify and make sure it was in the correct accounting string or funding source." (Kumrow Dep. 30–31.) All funds within the Sidewalk Fund are assigned to a specific pedestrian benefit zone, and NDOT tracks the money and knows how much has been allocated for sidewalks in each particular pedestrian benefit zone. (*Id.* at 31.) Kumrow also testified, however, that even when Metro's engineering division decides to build sidewalks within a particular pedestrian benefit zone, and NDOT communicates to engineering that there is money in the Sidewalk Fund allocated to that zone, engineering might or might not decide to use some, all, or none of the available funds allocated for that zone. (*Id.* at 31–34.)

---

[10] The due process claim apparently relates to payments into the Sidewalk Fund with respect to which takings claims would be barred by the one-year statute of limitations.

As of May 2023, when *Knight* was issued, over $14,000,000 in Metro's account was in the accounting string for the Sidewalk Fund. Since then, approximately $4,000,000 has been paid out of the Sidewalk Fund to reimburse claimants who submitted successful claims through the Metro Sidewalk Claim Process, to pay interest on those claims, and to reimburse a smaller number of claimants who paid to build sidewalks rather than paying an in-lieu fee. (*Id.* at 38–40.)

Kumrow further clarified in her Declaration, however, that "[e]very dollar that has been paid out of the Sidewalk Fund to build sidewalks can be traced back to a specific in-lieu fee and permit, within that same pedestrian benefit zone." (Kumrow Decl., Doc. No. 110-4 ¶ 4.) She also states that, although Metro has temporarily suspended expenditures from the Sidewalk Fund during the pendency of the Sidewalk Claim Process, "NDOT has and will continue to allocate all funds received as in-lieu fees (including any such fees paid by the Plaintiffs) within the same pedestrian benefit zone as the applicant's property and has no plans to deviate from that course of managing the Sidewalk Fund." (*Id.* ¶¶ 5–6.) In addition, if necessary, Metro Council would be "able to satisfy any expenses incurred against the Sidewalk Fund, including any in-lieu fee refunds that might come due at some point in the future, by various means, including specific appropriation." (*Id.* ¶ 7.)

Relying on Kumrow's deposition testimony that money was paid out of the Sidewalk Fund to reimburse claimants who submitted claims in accordance with the Metro Sidewalk Claim Process, including claimants who paid the in-lieu fee and those who built sidewalks, the plaintiffs insist that Metro has misused the money in the Sidewalk Fund by spending it in ways not contemplated by the Sidewalk Ordinance, has diminished the amount of money available to reimburse the plaintiffs if their in-lieu payments have not been used within ten years of payment to build sidewalks in the pedestrian benefit zone in which the subject properties are located, and

has not provided the plaintiffs any procedure for challenging Metro's misallocation or for seeking reimbursement of their in-lieu payments. The plaintiffs also take issue with Kumrow's Declaration to the extent, the plaintiffs claim, it is inconsistent with her deposition testimony.

### 2. Discussion

The Fourteenth Amendment to the U.S. Constitution provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law." To prove a § 1983 procedural due process claim, the plaintiffs must establish that

> (1) [they have] a life, liberty, or property interest protected by the Due Process Clause, (2) [they were] deprived of this protected interest, and (3) the state did not afford [them] adequate procedural rights prior to depriving [them] of [their] protected interest.

*Durham v. Martin*, No. 21-5099, 2021 WL 6777028, at *5 (6th Cir. Nov. 23, 2021) (citing *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)). In considering procedural due process claims, the court must first "determine whether the interest at stake is within the Fourteenth Amendment's protection of liberty and property." *Ferencz v. Hairston*, 119 F.3d 1244, 1247 (6th Cir. 1997). And only if the plaintiff establishes the deprivation of such an interest does the court "consider the form and nature of the process that is due." *Id.* (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 570–71, (1972)).

Protected property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577. In other words, the court must look to Tennessee law to determine whether the plaintiffs have a protected property interest. *Smallwood v. Cocke Cnty. Gov't*, 290 F. Supp. 3d 755, 761 (E.D. Tenn.), *aff'd*, 754 F. App'x 310 (6th Cir. 2018); *see also Agrawal v. Montemagno*, 574

F. App'x 570, 578–79 (6th Cir. 2014) ("A protected property interest is one to which a plaintiff has a legitimate claim of entitlement under state law." (citing *Ferencz*, 119 F.3d at 1247)).

The Supreme Court has recognized the existence of a protected property interest when a claimant has a "present entitlement" to "exercise ownership dominion over real or personal property, or to pursue a gainful occupation." *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001). However, a plaintiff "can have no legitimate claim of entitlement to a discretionary decision." *Richardson v. Twp. of Brady*, 218 F.3d 508, 517 (6th Cir. 2000). In the context of government benefits, for example, such as pension benefits, a claimant is generally not deemed to have a protectable interest when the "benefit has not yet commenced" and "a determination of entitlement has not yet been made." *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 317 (M.D. Pa. 2004) (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 60 (1999)). "Entitlement to a benefit, creating a 'property' interest under the Due Process Clause, arises only when government has created an unqualified right to receive the benefit or when the appropriate authority has deemed conditions to receipt satisfied." *Id.* (citing *Lujan*, 532 U.S. at 194–98; *Am. Mfrs.*, 526 U.S. at 60). In other words, there is a "difference between eligibility and entitlement. The former means that the person has an ability to seek a benefit. The latter means that the person may now control it. And only the latter is constitutionally significant for purposes of 'property.'" *Id.* (citing *Am. Mfrs.*, 526 U.S. at 60). "To hold otherwise would render every question of state contract and statutory interpretation a matter of constitutional concern. . . . Not every alleged breach of a state contract is a due process claim." *Id.* at 318 (citations omitted).

As for the deprivation element, "[a] constitutionally cognizable deprivation occurs when an individual's reasonable expectation to use and control a benefit is so diminished as to reduce substantially the value of the benefit." *Id.* at 321 (citing *Mennonite Bd. of Missions v. Adams*, 462

U.S. 791, 798 (1983). "Reasonable expectation, like legitimate entitlement, is founded on governing rules and understandings, usually state law. When these rules accord a right to use or control a benefit, and the exercise of that right is significantly restricted or eliminated, the Constitution recognizes a deprivation." *Id.* (internal citation omitted). However, the due process clause also does not protect against the "spectre of some future deprivation." *Muscarello v. Winnebago Cnty. Bd.*, 702 F.3d 909, 914 (7th Cir. 2012).

Metro, in this case, argues that the plaintiffs cannot establish either a protected property interest or the deprivation of any such interest. The plaintiffs counter that none of the cases cited by the defendant is on point and insist that the Ordinance's use of "shall" entitles them to a refund of their in-lieu payments if the funds are not spent on sidewalks. They further insist that they have been deprived of that entitlement by Metro's expenditure of money from the Sidewalk Fund on something other than building sidewalks within the pedestrian benefit zone from which the funds were received.

The court finds the plaintiffs' due process claim to be utterly without merit. Although neither party points to a case that is remotely on point (likely because the situation is unusual and the plaintiffs' claim is such an outlier), the plaintiffs' entitlement to repayment is clearly contingent upon whether, in ten years from the date of their payments (which cannot have occurred prior to 2017, because that was when the Sidewalk Ordinance was first enacted), the funds have been spent on building sidewalks within the appropriate pedestrian benefit zone. If they have not been spent for that purpose, *then* the plaintiffs will be entitled to reimbursement. Until then, their eligibility for reimbursement is entirely conditioned on matters that are outside their control. They do not have a present entitlement to control those funds or to seek reimbursement.

As for deprivation, it is difficult to see how the plaintiffs can have been deprived of funds to which they are not yet, and may never be, entitled. Moreover, even if the court were to presume that the plaintiffs have a protected property interest in the return of the unspent in-lieu funds, their argument about the misuse of the Sidewalk Fund is entirely speculative. Money, as Metro points out, is fungible. The plaintiffs are not entitled to a return of the specific dollars they paid into the fund, and the fact that Metro is allocating funds from the Sidewalk Fund to pay claims made through the Sidewalk Claim Process does not diminish the plaintiffs' expectation that they will be reimbursed if, in fact, they become entitled to reimbursement. There is no suggestion on the record, for example, that Metro is insolvent or that it would be unable to reimburse the plaintiffs as required by the Ordinance.

In short, the plaintiffs' procedural due process claim fails as a matter of law on the facts presented. None of the plaintiffs is entitled to an immediate return of funds, and they have not been prospectively denied the recovery of funds to which they might someday be entitled. Metro is entitled to summary judgment on the plaintiffs' due process claim. Because this holding applies to all plaintiffs, the court has no need to address the plaintiffs' contention that Infinium's due process claim somehow survives, even though Infinium lacks standing to pursue a takings claim.

## IV.    CONCLUSION

For the reasons set forth herein, Metro's Motion for Summary Judgment will be granted in part and denied in part. An appropriate Order is filed herewith.


_____
ALETA A. TRAUGER
United States District Judge